**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

EDWARD BURLEY,

              *Plaintiff,*

*v.*

J. QUIROGA,
WILLIAMSON,
SCOTT HOLMES,
R. KLATT,
and HAROLD GILKEY,

             *Defendants.*

_____/

CASE NO. 16-cv-10712

DISTRICT JUDGE GEORGE CARAM STEEH
MAGISTRATE JUDGE PATRICIA T. MORRIS

### REPORT AND RECOMMENDATION ON DEFENDANTS GERLACH, HOLMES, AND SHERRY'S MOTION TO STRIKE (R. 142) AND MOTION FOR SUMMARY JUDGMENT (R. 130)

I.     **RECOMMENDATION**

Plaintiff Edward Burley, an inmate with a hearing impairment, alleges that Defendants violated a host of constitutional and statutory provisions. (R. 1.) The present Report addresses two motions by Defendants Roger Gerlack, Brenden Sherry, and Scott Holmes. The first motion asks the Court to strike Plaintiff's recent affidavit as a sham. (R. 142.) I recommend that the Court **DENY** the motion, as the affidavit does not contradict Plaintiff's previous testimony and therefore is not a sham affidavit. The second motion seeks summary judgment. (R. 130.) Because the parties have stipulated to dismiss Defendants Gerlach and Sherry, I recommend the Court **DISMISS** them from the suit. That leaves Defendant Holmes; I conclude that the claims against him are either unexhausted or

1

lack merit, and accordingly recommend the Court **GRANT** the motion for summary judgment (R. 130) and **DISMISS** Defendant Holmes from the suit. Finally, I recommend that Defendants' request for sanctions (R. 139, PageID.1636 n. 1) be **DENIED**.

## II.   <u>REPORT</u>

### A.   **Facts and Procedural History**

While incarcerated in 2006, Plaintiff received a hearing aid. (R. 130-6, PageID.1397, 1404.) According to a medical note from August 2009, hearing evaluation and speech testing revealed hearing loss, characterized variously as profound or moderate to severe. (R. 153, PageID.2109.) Other evidence also could suggest hearing loss. (R. 88, PageID.939 ("Amplification is recommended bilaterally.")); (R. 88, PageID.958 ("[Officers] admit that [Burley] will generally not hear the loudspeaker when called . . . and will not hear when he is otherwise being called unless they gain eye contact (in order for him to read lips). They report no inconsistencies with these findings and that he is also always seen [with his] hearing aide [*sic*] on.")); (R. 88, PageID.959 ("During today's visit [Plaintiff] displays difficulty hearing normal conversation and appears that he is lip reading. When speaking to [Plaintiff] without him looking directly at me he doesn't acknowledge hearing me."); (R. 88, PageID.966 ("I then placed a very sensitive . . . stethoscope in his ears and spoke LOUDLY (behind a closed hand) and he DID NOT EVEN FLINCH.")).

A 2011 report mentions suspicions that Plaintiff exaggerated his hearing loss. (R. 153, PageID.2278, 2300); *see also* (R. 153, PageID.2315 (medical report from Defendant Brendan Sherry stating, "Reviewed documents today which state 'responses appear to be

suprathreshold'. Called and spoke with audiologists to clarify and was informed impression is that patient is suspected to have exaggerated his responses as his acoustic reflexes are present at normal levels and this is not consistent with profound hearing loss which is what he is demonstrating")). Other records indicated that Plaintiff's hearing aid functioned properly and allowed him functional hearing. *See* (R. 88, PageID.961 ("Based on acoustic reflex findings . . . it was felt that his current hearing aid was appropriate at that time [*i.e.*, in January 2011].")); (R. 88, PageID.966 ("[C]urrent [hearing aid] device IS WORKING per audiology [in November 2011]. . . . [H]e can hear my relatively deep voice seemingly well though I spoke more loudly than [normal].")); (R. 88, PageID.974 ("[Plaintiff] able to hear my voice for the most part and is wearing his hearing aid.").) In November 2011, Dr. Gerlach was "inclined to believe he probably does have profound S-N hearing loss approaching deafness." (R. 88, PageID.966.) The problem, he concluded, was that "we need to (or should have) proof positive objective evidence to PROPERLY accomadate [*sic*] his special needs[.]" (*Id.*)

The following year, on January 2, 2012, Plaintiff refused offsite testing that would "confirm or deny suspicions of exaggerating hearing loss." (R. 153, PageID.2098.) He feared that the testing, which required placing wires on his head, would trigger migraines. (R. 130-6, PageID.1403; R. 153, PageID.2349.)

Nonetheless, that same year, he was granted a "special accommodation" to use a telecommunications device for the deaf (TDD) for telephone conversations. (R. 130-5,

PageID.1352; R. 139, PageID1636-1637.)[1] A special accommodation allows an inmate to use assistive devices when he or she has "a medical condition which restricts his/her ability to function adequately in the institutional environment." MDOC PD 04.06.160(E) (eff. June 30, 2008). The accommodation can be cancelled after a medical practitioner examines the inmate. *Id.* PD 04.06.160(K). "An employee who observes a prisoner acting inconsistently with a medical restriction" must report the observation to the medical practitioner, who after examination can decide whether to cancel the accommodation. *Id.* PD 04.06.160(M).

Dr. Holmes treated Plaintiff at the Carson City Correctional Facility, where Plaintiff arrived sometime around August 2013. (R. 1, PageID.8; R. 153, PageID.2793.) A few months after entering that facility, Plaintiff complained that a tube in his hearing aid had broken and needed repair, which was authorized in December. (R. 153, PageID.2873, 2899.) Plaintiff then requested "an assistant due to hearing concerns." (R. 153, PageID.3010.) A day later, the audiologist finished repairs on the hearing aid. (R. 153, PageID.3011.) Dr. Holmes's notes for that day state, "patient back from audiology offsite 1/9/14. [N]o changes." (R. 153, PageID.3021.) A few days after the repair Dr. Holmes wrote, "patient's recent request for 'assistant due to hearing concerns' is noted but there's no obvious and severe clear medical neces[s]ity for such." (R. 153, PageID.3025.)

---

[1] "A teletypewriter ("TTY"), also known as a telecommunication device for the deaf ("TDD") is a telephone equipped with a keyboard and a display screen. TTY devices enable hearing impaired individuals to communicate over telephone lines by sending and receiving typed messages." *Holmes v. Godinez*, 311 F.R.D. 177, 196 (N.D. Ill. 2015).

Plaintiff explained—in the sworn affidavit Defendants now seek to strike—that he filed a grievance against Dr. Holmes in October 2013 regarding treatment for a hernia. (R. 139-4, PageID.1678.) After that filing, but before their appointment on February 4, 2014, Dr. Holmes allegedly told Plaintiff, "You like to file grievances against me." (*Id.*)

The next relevant evidence concerns the February appointment. A note from January 30, 2014, mentions that Plaintiff had an upcoming session with Dr. Holmes. (R. 153, PageID.3050.) Around that time, Dr. Holmes testified, he received information that Plaintiff "was using the [teletyperwriter (TTY) (a type of TDD device)] phone . . . in a fashion which would display . . . normal powers of hearing." (R. 153, PageID.1353.); *see also* (*id.* (noting that Plaintiff was seen "not using the phone in a manner consistent with a person with such a severe hearing disability that would absolutely need that TTY phone").) Dr. Holmes assumed that the observations came from corrections officers, and he noted that he had "to be sensitive to the corrections officers too." (*Id.*)

For his part, Plaintiff's affidavit explains that when using the TTY device he often selected a video communication option, allowing him to lift the phone from the TTY cradle and speak into the receiver. (R. 139-4, PageID.1678.) But he heard no responses; instead, to receive communications he would return the phone to the cradle to read the TTY display, which translated the spoken responses into text. (*Id.*)

Dr. Holmes's notes from the February 4, 2014 visit state that Plaintiff explained he needed an assistant for daily activities and he could not hear the public announcement speakers even with his hearing aid. (R. 153, PageID.3055.) The notes also indicate that Plaintiff "has been using the TTY phone with the receiver/speaker device at his ear . . . not

5

sitting on the device which would indicate that the patient's hearing is sufficient to hear via normal phone receiver volume." (*Id.*) The notes then mention Plaintiff's refusal in January 2012 to undergo testing due to the "unreasonable fear of migraines." (*Id.*) For these reasons, Dr. Holmes's discontinued the special accommodation for the TTY phone. (*Id.*) According to deposition testimony by Dr. Holmes and Plaintiff, an examination was also conducted at the appointment. (R. 153, PageID.1354, 1368, 1400.) Both agree that Dr. Holmes put his hand over his mouth and said something, which Plaintiff told Dr. Holmes he could not understand. (R. 153, PageID.1354, 1400.)

About a week after his appointment with Dr. Holmes, Plaintiff was transferred from the Carson City Facility. (R. 153, PageID.3065-3066.) At his later deposition, he testified that during his stay at Carson City, the chaplain prohibited him from forming a religious group. (R. 130-6, PageID.1408.)

Plaintiff filed his complaint on February 25, 2016, alleging various claims against the Michigan Department of Corrections (MDOC), a cadre of state officials and employees, and "non-state" Defendants Sherry, Gerlach, and Holmes (R. 1.) Shortly after, all pretrial matters were referred to me. (R. 8.) Many Defendants have since been dismissed from the case. (R. 76, 99.)

The complaint's specific allegations against Dr. Holmes were as follows:

> Defendant Scott Holmes was personally involved in all aspects when he refused to effectively treat my hearing disability by way of proper medical accommodations. Defendant Holmes did in fact retaliated [*sic*] against me by cancelling my special accommodation notice/detail for my TDD phone when I filed two grievances against him. Defendant Holmes was involved in all aspects in the failure to accommodate hearing impairment.

6

(R. 1, PageID.37.)

The complaint also lists numerous general allegations regarding Plaintiff's hearing impairment. He claimed that Defendants had failed to accommodate his impairment by, among other things, providing him with interpreters, videophones, amplifiers, hearing aids, a TTY or TDD, or other instruments allowing him to participate in religious ceremonies, remain safe from other inmates and during emergencies (which he struggles to hear), and communicate with his family and friends. (R. 1, PageID.1-3.) His complaint states that using a regular telephone is "tedious" because he frequently must ask the other caller to repeat statements. (R. 1, PageID.12.) He cannot, therefore, use a traditional telephone and must rely on written correspondence to communicate with family. (R. 1, PageID.12.)

TDDs are "inferior" and "outdated," according to Plaintiff, and most of the deaf community use videophones instead, which can accommodate sign language. (R. 1, PageID.11-13.) Lip-reading, too, is difficult and ineffective, yet MDOC failed to provide sign language interpreters "to communicate effectively with MDOC officials, MDOC employees, and medical personnel." (R. 1, PageID.16.) Nor does MDOC have interpreters for inmates' medical appointments or other prison programs. (R. 1, PageID.17.) For example, Plaintiff "would like to attend [religious services] but sometimes has difficulty understanding without an interpreter." (*Id.*) Also, MDOC facilities lacked effective alert, alarm, and announcement systems to accommodate his impairment, particularly at night when he removes the hearing aid. (R. 1, PageID.18.) Without an interpreter or other assistance, hearing-impaired inmates were prevented from participating meaningfully in disciplinary and other hearings. (R. 1, PageID.18-19.)

7

As for hearing aids, the complaint states that his request for a second hearing aid was denied. (R. 1, PageID.15.) MDOC staff were untrained in dealing with the hearing impaired; they were insensitive and even cruel to Plaintiff, he contends in his complaint. (R. 1, PageID.19-20.)

Plaintiff's first two legal claims are that Defendants violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701, *et seq.*, by discriminating against him because of his hearing disability. (R. 1, PageID.22-28.) The next claims come under 42 U.S.C. § 1983.[2] Plaintiff alleges that Defendants violated his First Amendment free exercise rights "by substantially burdening his religion exercise." (R. 1, PageID.29.) The final listed claim is that Defendants violated his First Amendment free speech rights by denying him access to devices allowing him to communicate with people outside of prison. (R. 1, PageID.30-31.) Earlier in the complaint, Plaintiff also states that Defendants "have subjected plaintiff to the intentional infliction of extreme emotional distress [IIED] by not properly accommodating his handicap needs." (R. 1, PageID.21.) The parties treat this as a separate claim. (R. 130, PageID.1319-1322; R. 139, PageID.1657.) They now also discern an Eighth Amendment deliberate indifference claim in Plaintiff's complaint. (R. 130, PageID.1310; R. 139, PageID.1651.)[3]

---

[2] It is unclear that Plaintiff meant to levy each § 1983 claim against each Defendant. Under the "Count" heading, Plaintiff usually listed specific Defendants involved in that count, along with a catchall "and all aforestated Defendants." *See, e.g.*, (R. 1, PageID.28-30.) But in the paragraphs under the headings, Plaintiff did not always include "all" Defendants in the specific allegations. In his free speech claim, the paragraphs mention only specific Defendants, not including Holmes. (R. 1, PageID.30-31.) Plaintiff was unrepresented when he filed the complaint and the parties have not addressed this issue. Consequently, I will read the complaint as including Holmes in these § 1983 claims.

[3] Neither party points to a specific portion of the original complaint containing this claim, nor have I found discussion of the Eighth Amendment or deliberate indifference in that complaint. As for the amended

**B.    Analysis**

**1.    Threshold Issues**

Before beginning the summary judgment analysis, two threshold issues must be addressed. The first is the stipulated dismissal of Defendants Dr. Gerlach and Sherry and Defendant's related request for sanctions. The second is the motion to strike. (R. 142.)

**a.    Defendants Gerlach and Sherry**

As an initial matter, the parties have stipulated to dismiss Dr. Gerlach and Sherry. (R. 147.) Prior to the stipulation, Plaintiff stated in his response brief that he "is not contesting the motion for summary judgment as to Sherry or Gerlach." (R. 139, PageID.1636 n. 1.) Accordingly, I recommend that the Court dismiss these two Defendants.

Tucked in a footnote in the reply brief, Defendants ask the Court to "consider sanctioning Plaintiff" or his counsel. (R. 141, PageID.1798 n. 1.) The factual basis for sanctions is Plaintiff's refusal to dismiss the claims when Defendants sought concurrence before filing their motion. (*Id.*, citing E.D. Mich. L.R. 7.1.) Defendants consequently spent time and resources on claims that Plaintiff promptly abandoned.

This is potentially sanctionable under 28 U.S.C. § 1927, which allows sanctions of "[a]ny attorney or other person admitted to conduct cases in any court . . . who so multiplies the proceedings in any case unreasonably and vexatiously." "[S]anctions under 28 U.S.C. § 1927 'require a showing of something less than subjective bad faith, but something more

---

complaint, a few proposed additions that the Court rejected mentioned deliberate indifference, but not regarding Dr. Holmes. (R. 58, PageID.283-284.) At his deposition, Plaintiff accused Dr. Holmes of deliberate indifference. (R. 153, PageID.1407.) Dr. Holmes does not argue that the complaint fails to state a claim of deliberate indifference, and I will address the claim under the summary judgment framework.

than negligence or incompetence.'" *Knopf v. Elite Moving Sys.*, 677 F. App'x 252, 257 (6th Cir. 2017) (citation omitted). Even in the context of this statute, however, the Sixth Circuit has admonished courts to remain sensitive to the "extreme" nature of a sanction imposing awards like attorney's fees. *Ridder v. City of Springfield*, 109 F.3d 288, 299 (6th Cir. 1997).

Defendants cite *Dupree v. Cranbrook Edu. Comm.*, No. 10-12094, 2012 WL 1060082, at *12-14 (E.D. Mich. Mar. 29, 2012), where the court sanctioned counsel $250 for withdrawing various claims after failing to concur in a motion for summary judgment (the counsel did not even respond to the request for concurrence, in fact). The court explained that the purpose of Local Rule 7.1, requiring the moving party to seek concurrence, is to avoid the moving party from needlessly expending resources. *Id.* at 13.

Here, Defendants are understandably miffed at having worked up a brief only to have Plaintiff wave the white flag. But there is no indication that Plaintiff's change of heart reflects bad faith or even simple inadvertence. Unlike *Dupree*, Plaintiff appears to have responded to the concurrence request. And the proceedings have not bloomed into a multiplicity of motions and hearings stretching on into the future. It is even possible that the cogency of Defendants' brief convinced Plaintiff to capitulate, in which case Defendants' work would have been time well spent. In any event, the lack of evidence that Plaintiff acted unreasonably leads me to recommend against awarding sanctions.

### b.    Defendants' Motion to Strike (R. 142.)

Defendant's motion to strike is another threshold issue because it potentially affects the outcome of the motion for summary judgment. For this reason, even though the motion to strike is a non-dispositive pretrial matter that I could resolve under the order of reference

(R. 8) and 28 U.S.C. § 636(b)(1)(A), *see, e.g.*, *Hennigan v. General Elec. Co.*, No. 09-11912, 2014 WL 4411675, at *2 (E.D. Mich. Sept. 8, 2014), I will address it in the Report and Recommendation, *cf. In re General Motors OnStar Litig.*, No. 2-CV-DT, 2011 WL 679510, at *3 n. 1 (E.D. Mich. Jan. 12, 2011) (noting that although the motion to strike was non-dispositive, and thus within the magistrate's authority to dispose of, it was "so closely linked" to a matter outside the magistrate's authority that a report and recommendation was more appropriate), *rep. & rec. adopted by* 2011 WL 674727 (E.D. Mich. Feb. 16, 2011).

Defendant[4] wants Plaintiff's recent affidavit stricken under the sham affidavit doctrine. (R. 142, PageID.1824-1825.) That doctrine prohibits a party from creating "a disputed issue of material fact by filing an affidavit that contradicts the party's earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006). Thus, Defendant must demonstrate a contradiction between the affidavit and Plaintiff's testimony.

Defendant attempts to do this by finding testimony that contradicts his supposed statement to Plaintiff that "[y]ou like filing grievances against me." (R. 142, PageID.1824; R. 139-4, PageID.1678.) Defendant points to spots in Plaintiff's deposition when Plaintiff mentioned his interactions with Defendant. For example, Plaintiff was asked to "describe" his "familiarity" with Defendant. (R. 142, PageID.1834, quoting R. 130-6, PageID.1400-1401.) Plaintiff responded that Defendant had provided improper treatment and canceled

---

[4] From this point on, I will refer only to the remaining Defendant, Dr. Holmes, and thus use the singular.

his TDD phone after a brief examination: "He brought me in a room. He covered his mouth and he said something. I didn't know what he said. Okay, take him back." (*Id.*) Plaintiff was then questioned whether this episode comprised his "allegation against Dr. Holmes or is there more than that that you allege against him . . . ." (*Id.*) There was more, Plaintiff stated, including that Defendant

> was very, very condescending and demeaning to me. He would sometimes mock me for my disability. . . . I would tell him I need to get to the audiologist, I'm having problems. He wrote the supervising doctor when they denied my batteries for 45 days and I grieved that. I kited him. I spoke with him. He said you shouldn't come to prison with a hearing impairment.

(*Id.*)

The next question mentioned that "it sounded like there was also at least one or two fairly specific incidences" regarding Defendant, and asked, "Do you recall the date either specifically or just generally that those events transpired . . . ." (R. 142, PageID.1835, quoting R. 130-6, PageID.1401.) "Not from my independent recollection," Plaintiff stated. (*Id.*) He was then asked why he had filed a grievance against Defendant, to which he responded:

> I do recall that I filed two grievances against Mr. Holmes for denial of access to proper medical care. One that I distinctly remember was a hernia that I had. Originally he said that I'm going to have that hernia fixed and he recanted on it, I filed a grievance relating to that. He was very, very disturbed over that because when I would come to medical for blood pressure test or asthma he would grimace me after the grievances were filed on that individual and then from that point it appeared to me that the medical treatment that he rendered was woefully inadequate so I had addressed it accordingly in subsequent grievances.

(R. 142, PageID.1835-1836, quoting R. 130-6, PageID.1401.) Finally, Plaintiff was asked, "Is there anything that we haven't discussed about today that you will testify at court or

12

present as evidence?" (R. 142, PageID.1836, quoting R.130-6, PageID.1420 (quotation marks omitted).) "That remains to be seen during our discovery," he replied. (R. 130-6, PageID.1420.)

Defendant discerns a host of contradictions in these materials. The inquiry about allegations against Defendant, for instance, only elicited testimony that Defendant stated the hearing impaired should not come to prison. (R. 142, PageID.1838.) Plaintiff said nothing about the newly recalled statement, Defendant notes. (*Id.*) Defendant also characterizes Plaintiff's testimony as asserting "that he could not recall when he spoke with Dr. Holmes about any grievance." (*Id.*, citing R. 130-6, PageID.1401.) Yet in his affidavit, Defendant argues, Plaintiff now "[m]iraculously" recalls the discussion. (*Id.*) This is a contradiction, according to Defendant. (*Id.*)

As the Sixth Circuit discussed in *Aerel*, the contradiction between the testimony and the affidavit must be direct. 448 F.3d at 908. An affidavit that "fills a gap left open by the moving party" on an issue Plaintiff was not directly questioned about is not prohibited by the sham affidavit doctrine. *Id.* at 908-909. If there is no direct contradiction, a court should not strike the affidavit unless it represents an attempt to fabricate a "sham fact issue." *Id.* at 908 (citation omitted). In these circumstances, when no contradiction exists, the factors to consider include whether the affiant was cross-examined, whether he had the relevant evidence earlier, and whether the testimony displays confusion that the affidavit seeks to clarify. *Id.* at 908-909.

I conclude that Plaintiff's testimony is consistent with his recent affidavit. A logical contradiction occurs when two statements posit situations or states of affairs that cannot

both be true. *Contradiction*, Stanford Encyclopedia of Philosophy (updated Aug. 29, 2018), *available at* https://plato.stanford.edu/entries/contradiction/. For instance, it cannot be true that the sky is both "blue" and "not blue." *Id.* Here, then, the precise question to ask of Plaintiff's testimony is whether it includes a statement that Defendant did *not* say "You like filing grievances against me." Plaintiff never made such an assertion. The next, more general, inquiry is whether Plaintiff testified to any state of affairs that could not be true if the affidavit statement was true; for example, did he say Defendant never spoke to him beyond what Plaintiff recalled at the deposition? Again, I find nothing in the testimony to that effect, either directly or indirectly.

Defendant makes much of Plaintiff's ending statement that evidence might come out during discovery that supplements his testimony. Defendant pounces on this, noting the affidavit was divulged "*after* discovery ended." (R. 146, PageID.1935.) Even as a pedantic matter, however, there is no direct contradiction: Plaintiff did not state that he would use only what was found, created, or recalled during discovery. He simply said that "it remains to be seen during our discovery" whether he would use other evidence or testimony. (R. 130-6, PageID.1420.)

Defendant fares no better when he asserts that "Plaintiff testified at his deposition that he could not recall when he spoke with Dr. Holmes about any grievance." (R. 142, PageID.1838, citing R. 130-6, PageID.1401 (emphasis removed).) Plaintiff was never asked if or when he talked to Defendant about the grievances. Instead, the question's preface mentioned "one or two fairly specific incidences that you were alleging that you weren't satisfied with Dr. Holmes'[s] actions." (R. 130-6, PageID.1401.) Following that

14

came the question, "Do you recall the date either specifically or just generally that those other events transpired from your independent recollection?" (*Id.*) Thus, he was not directly questioned about Defendant's statements concerning grievances; rather, the inquiry sought information on when the events leading to the grievances occurred. Those events did not encompass Defendant's alleged statement reported in the affidavit. Even if they did, the only possible contradiction would be on the date of the statement, not its existence, and Plaintiff's affidavit would appear to supplement the testimony.

For these reasons, I suggest that no contradiction exists. It seems that Defendant's real gripe is that during the deposition Plaintiff should have known and testified about the alleged statement. Thus, even if no direct conflict exists, it would nonetheless be a sham affidavit. *See Aerel*, 448 F.3d at 908-909. This contention has more merit, but ultimately I would reject it because the deposition questioning did not fully explore the issue. *See id.* at 909. If it is relevant at all, Defendant's alleged statement goes to his retaliatory animus. While the deposition covered the episodes underlying the grievances and some of Defendant's actions that might suggest retaliation, *see, e.g.*, (R. 130-6, PageID.1401), neither Defendant's statements nor the subject of retaliation was investigated in any depth. Consequently, even in retrospect, the transcript does not show a purposeful evasion of divulging this bit of evidence. As such, I recommend denying Defendant's motion to strike.

### 3.    Summary Judgment Standard

When a movant shows that "no genuine dispute as to any material fact" exists, the court will grant her motion for summary judgment. Fed. R. Civ. P. 56(a). In reviewing such motion, the court must view all facts and inferences in the light most favorable to the non-

15

moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears "the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)) (internal quotation marks omitted). In making its determination, a court may consider the plausibility of the movant's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party cannot meet its burden of proof. *Celotex*, 477 U.S. at 325.

The non-moving party cannot rest merely on the pleadings in response to a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). The non-movant cannot withhold evidence until trial or rely on speculative possibilities that material issues of fact will appear later. 10B Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2739 (3d ed. 1998). "[T]o withstand a properly supported motion for summary judgment, the non-moving party must identify specific facts and affirmative evidence that contradict those offered by the moving party." *Cosmas v. Am. Express Centurion Bank*, 757 F. Supp. 2d 489, 492 (D. N.J. 2010). In doing so, the non-moving party cannot simply assert that the other side's evidence lacks credibility. *Id.* at 493.

When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine

16

issues of material fact exist. *Street*, 886 F.2d at 1479-80. The court will rely on the "facts presented and designated by the moving party." *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404 (6th Cir. 1992). After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

### 4.    The ADA and Rehabilitation Act Claims

It is unclear whether Plaintiff intended to lodge the ADA and Rehabilitation Act claims against Defendant in addition to the other Defendants. There is reason to doubt that these statutory claims apply to non-public entities such as Defendant, an employee of a private contractor. *See Lee v. Michigan Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) ("Lee may not maintain an action under the ADA or the RA against the individual defendants identified in his complaint because neither the ADA nor the RA impose liability upon individuals." (citing 29 U.S.C. § 794(b) and 42 U.S.C. § 12131(1)); *Cox v. Jackson*, 579 F. Supp. 2d 831, 852 (E.D. Mich. 2008) ("Defendant CMS is neither a state or local government, nor a department, agency, or instrumentality of the state. A private contractor does not become a 'public entity' under Title II merely by contracting with a governmental entity to provide governmental services.").

17

In any case, as the nonmoving party, Plaintiff was responsible for producing evidence in response to Defendant's evidence and arguments. *Peoples v. City of Detroit*, 891, F.3d 622, 630 (6th Cir. 2018). Not only has Plaintiff failed to do so, his response brief is completely silent on the statutory claims. A non-moving party's failure to address an argument in its opposition brief waives the argument. *Maher v. Int'l Paper Co.*, 600 F. Supp. 2d 940, 948-949 (W.D. Mich. 2009); *see also Raub v. Moon Lake Property Owners' Assoc.*, No. 1:15-CV-13480, 2017 WL 8896200, at *2 (E.D. Mich. Feb. 24, 2017) ("When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist."). Accordingly, any ADA or Rehabilitation Act claims against Defendant should be dismissed as waived.

### 5.    Section 1983 Claims

To prevail on a claim under 42 U.S.C. § 1983, a plaintiff must demonstrate facts showing (1) the conduct about which he or she complains was committed by a person acting under color of state law and (2) the conduct deprived him or her of a federal constitutional or statutory right. In addition, a plaintiff must allege that he or she suffered a specific injury because of the conduct of a particular defendant and must allege an affirmative link between the injury and that defendant's conduct. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976).

### a.    Exhaustion of Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") was passed in response to a "sharp rise in prisoner litigation in the federal courts." *Woodford v. Ngo*, 548 U.S. 81, 83

(2006). The Act attempted to ensure that "the flood of nonmeritorious [prisoner civil rights] claims [did] not submerge and effectively preclude consideration of the allegations with merit." *Jones v. Bock*, 549 U.S. 199, 202 (2007). A "centerpiece" of the PLRA was the "invigorated" exhaustion requirement, *Woodford*, 548 U.S. at 84 (quoting *Porter v. Nussle*, 534 U.S. 516, 524 (2002)), which provides that "[n]o action shall be brought with respect to prison conditions under [§ 1983] . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a) (2000). Suits "brought with respect to prison conditions" include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

Exhaustion of administrative remedies requires that (1) no remedies currently remain available, and (2) the remedies that had been available to the prisoner were "properly" exhausted. *Woodford*, 548 U.S. at 93. Whether the remedies were properly exhausted depends on "[c]ompliance with the prison grievance process," not any rules defined by the PLRA. *Jones*, 549 U.S. at 218. In other words, "[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Id.*

Turning to MDOC's requirements, "Grievances may be submitted regarding," among other things, "alleged violations of policy or procedure or unsatisfactory conditions of confinement which directly affect the grievant, including alleged violations of this policy and related procedures." MDOC PD 03.02.130(E) (eff. 7/9/2007). If the initial attempt to resolve the issue with the person involved is impossible or unsuccessful, the inmate must

19

then submit a Step I grievance form within five days. MDOC PD 03.02.130(V). If the grievance is accepted, the prison staff is required to respond in writing to a Step I grievance within fifteen days, unless an extension is granted. MDOC PD 03.02.130(X). The policy provides the following instructions regarding the information that needs to be included in a grievance:

> The issues should be stated briefly but concisely. Information provided is to be limited to the facts involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included.

MDOC PD 03.02.130(R).

If the inmate is not satisfied with the response, or does not receive a response within fifteen days, he must file a Step II appeal within ten business days. MDOC PD 03.02.130(BB). Once again, if the inmate is dissatisfied with the response at Step II or does not receive a response within fifteen days, he has ten business days to submit a Step III appeal to the Prisoner Affairs Section. MDOC PD 03.02.130(FF). "To file a Step III grievance, the grievant must send a completed Step III grievance, using the Prisoner/Parolee Grievance Appeal form . . . ." *Id.*

The Step III response concludes the administrative grievance process. According to MDOC policy, a grievance is not complete until the MDOC has responded to the Step III grievance. MDOC PD 03.02.130(B), (FF), (GG). *Woodford* and *Jones* require inmates to file grievances that conform to MDOC procedures in order to properly exhaust available remedies. 548 U.S. at 93; 549 U.S. at 218.

The question here is whether Plaintiff followed this grievance procedure. He filed the grievance at issue on January 13, 2014. (R. 65-3, PageID.537.) In it, he names RUM Schad, Nurse Keller, Dr. Holmes, [and] PA Fulsinger" as having committed "violations of Title II of the ADA, [and] Medical Details and Special Accommodation Notices (PD 05.05.160)." (*Id.*) More specifically, he claimed to

> have profound hearing loss in both ears. . . . I am having a difficult time functioning in the unit and throughout the institution (can't hear PA, officer's orders, etc, and can't hear the maintenance rover's). I submit that the aforementioned individuals are in violation of PD 04.05.160 as they are not []qualified health professional (Audiologist) to properly assist my ability to hear, and the need for an additional hearing aid. . . . They have also denied me reasonable accommodation for my hearing impairment. I have a Special Accommodation for "communication assistant," however, medical personal [*sic*] listed above has [*sic*] continually refused to afford me this accommodation.

(*Id.*) So Dr. Holmes was listed, and the lack of a second hearing aid was mentioned; the statements about the Special Accommodation could be read to reference the TTY, but the grievance was filed before the Accommodation was revoked on February 4, a situation I discuss below. MDOC rejected the claim at Step I, noting that Plaintiff's hearing aid was recently repaired and that he had an upcoming appointment with his medical provider to discuss these issues. (R. 65-3, PageID.538.)

Plaintiff then submitted his Step II grievance on February 3, 2014—a day before Dr. Holmes revoked the special accommodation. (R. 65-3, PageID.535.) The grievance does not name Dr. Holmes, but does complain that Plaintiff needs another hearing aid and "cannot safely live in a hostile environment without 'reasonable accommodation.'" (*Id.*) Further, "The MDOC has a blanket policy of denying [the] hearing impaired 2 hearing aids

due to budget concerns." (*Id.*) That grievance, too, was rejected because Plaintiff was being treated by a medical provider and the grievance amounted to a disagreement about treatment. (R. 65-3, PageID.536.)

Finally, at Step III, Plaintiff stated that he had "been discriminated against by Dr. Holmes for my hearing impairment, atypical hardship, and failure to afford me a reasonable accommodation," observing also Dr. Holmes's "propensity to discriminate against persons with disabilities." (R. 65-3, PageID.535.) The MDOC denied the grievance, again concluding that it merely represented "disagreement with the judgment" of his physician. (R. 65-3, PageID.534.)

Defendant pins his argument on the absence of his name on the Step II grievance form. (R. 130, PageID.1303-1304.) Because the MDOC policy requires grievances to include names, and the Step II grievance did not, Defendant concludes that Plaintiff failed to exhaust his remedies. (*Id.*) For his part, Plaintiff contends that his second grievance explicitly incorporated the arguments from his first. (R. 139, PageID.1642.) Even if not, he continues, his Step III grievance named "Dr. Holmes" and the MDOC addressed the merits throughout the process, waiving any procedural defaults. (R. 139, PageID.1643.)

Defendant is correct that a grievance exhausts administrative remedies only as to the individuals and issues named in the grievance. *See generally Ford v. Martin*, 49 F. App'x 584, 585 (6th Cir. 2002) (finding failure to exhaust when the issues in the "grievances did not raise the same issues as those asserted in the . . . complaint"); *Baldridge-El v. Gundy*, 238 F.3d 419 (6th Cir. 2000) (finding claims were properly dismissed when they were not included in the grievances the plaintiff had filed); *Pasley v.*

*Maderi*, No. 13-13251, 2014 WL 5386914, at *4 (E.D. Mich. Sept. 15, 2014) (finding that

a prisoner's grievance was properly exhausted only against those prison officials actually

named the complaint, and was not exhausted as to other prison officials who the prisoner

alleged in his complaint were also involved in his maltreatment). Defendant fails to cite

authority, however, for the proposition that a plaintiff cannot fulfill this requirement at

Steps II or III by incorporating his previous allegations. The point of requiring exhaustion

is to flag problems for prison officials and permit them to expeditiously resolve the issues.

*Jones*, 549 U.S. at 219; *Cook v. Caruso*, 531 F. App'x 554, 561-562 (6th Cir. 2013). I fail

to see how Plaintiff's incorporation of claims and names by reference impedes these goals.

The Step II grievance left no doubt that Plaintiff continued to press the claims made in Step

I.

And Plaintiff is correct that the MDOC overlooked any deficiency at Step II by

"opt[ing] to consider otherwise defaulted claims on the merits." *Reed-Bey v. Pramstaller*,

603 F.3d 322, 325 (6th Cir. 2010). The prison's "decision to review a claim on the merits

gives us a warrant to do so as well, even when a procedural default might otherwise have

resolved the claim." *Id.* Thus, the failure to name Dr. Holmes at Step II does not prevent

the Court from proceeding to the merits.

But the exhaustion requirement does have other work to do in this case. As noted

above, Plaintiff submitted both his Step I and II grievances before the February 4, 2014

appointment with Defendant, at which Plaintiff's special accommodation for a TTY was

revoked. The most concrete complaint in those two grievance forms focused on the refusal

to grant a second hearing aid. While the forms mentioned interference with accessing his

special accommodation—without any specifics on how Defendant interfered—they could

not have encompassed later events. Consequently, those grievances necessarily exclude

claims about Defendant's decision to end Plaintiff's special accommodation. Plaintiff's

Step III grievance, which came after February 4, referred to a "reasonable accommodation"

but failed to discuss Dr. Holmes's termination of his TTY privileges. Plaintiff has not

pointed to other grievances or actions relevant to exhaustion of the TTY issue. In sum,

Plaintiff never brought or exhausted grievances over Defendant's cancelling the

accommodation.

For these reasons, I recommend finding that Plaintiff properly exhausted claims

relating to the second hearing aid and other communication assistance (perhaps an

interpreter), but not the ending of the TTY accommodation.[5]

---

[5] It appears that these three classes of claims—the TTY accommodation, the second hearing aid, and the other communication assistance—constitute the full spectrum of Plaintiff's complaint. They reflect Plaintiff's response to the motion for summary judgment, which focuses on the first two issues and mentions the failure to provide an interpreter. (R. 139, PageID.1636 ("Instead, Dr. Holmes blocked Burley from obtaining a second hearing aid and cancelled his access to a text telephone ('TTY phone'), despite evidence that both accommodations were medically necessary. In doing so, Holmes violated Burley's constitutional rights as guaranteed by the First and Eighth Amendments, and intentionally inflicted emotional distress on Burley.")); (R. 139, PageID.1638 ("On many occasions the lack of a second hearing aid, other communicative device, or interpretive assistant hindered Burley's ability to fully participate in religious activities.").)

To be sure, Plaintiff fails to specify the date on which the second hearing aid was refused. In his statement of facts, Plaintiff says the request was denied after the February 4 appointment, citing Defendant's notes following that appointment. (R. 139, PageID.1638, citing (R. 153, PageID.3055).) But those notes say nothing about a second hearing aid; they mention only the TTY accommodation and neither directly not indirectly deny the hearing aid request. During his deposition, Defendant could not recall the date of the request or denial either. (R. 130-5, PageID.1358-1359.) Possibly, the particular request fell outside the exhausted January 2014 grievance. But Defendant does not make this claim, and the January grievance did include broad contentions that could encompass this request. Also, a pre-grievance record from Dr. Holmes concluded that a communication "assistant" was unnecessary, which perhaps referred to the additional hearing aid. (R. 153, PageID.3025.) Consequently, I will assume that the complaints in that grievance challenge the refusal to grant a second hearing aid.

Plaintiff's response brief similarly makes a questionable conclusion concerning the date Plaintiff requested an interpreter for "prison activities, including religious services." (R. 139, PageID.1638.) He cites

### b.    Eighth Amendment Deliberate Indifference

The first constitutional issue is whether Defendant treated Plaintiff with deliberate indifference. (R. 130, PageID.1310.) In *Estelle v. Gamble*, the Supreme Court held "that deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment's Cruel and Unusual Punishment Clause because it constitutes the "unnecessary and wanton infliction of pain" and is "repugnant to the conscience of mankind" by offending our "evolving standards of decency." 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 97, 104 (1976)). To establish a cognizable claim, Plaintiff's allegations must show Defendant's 'sufficiently harmful' acts or omissions. *Id.* at 106. "[I]nadvertent failure to provide adequate medical care . . . will not violate the Constitution." *Id.*

The "deliberate indifference" inquiry has objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citing *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). The objective inquiry asks whether the deprivation was "sufficiently serious," which a claimant satisfies when his or her condition "has been diagnosed by a physician as

---

a short report from Dr. Holmes completed on January 9, 2014, for the assertion that "Burley asked Dr. Holmes for a second hearing and for an interpreter to help him fully participate in prison activities, including religious services." (*Id.*, citing R. 153, PageID.3025, 3055.) But while the first cited page mentions an "assistant," neither it nor the second cited page say anything about religious services. In fact, it is hard to tell whether Plaintiff means to hold Dr. Holmes responsible for the lack of an interpreter. As noted above, the introduction in his brief discusses only the termination of the TTY device and the denial of the second hearing aid. He mentions the refused "interpreter" only three times, (R. 139, PageID.1638, 1644, 1645), and the lack of "other communicative device" once. (R. 139, PageID.1645.) He never explains what that other device would be or whether Dr. Holmes even had authority to order an interpreter. His complaint suggests that this claim is aimed at MDOC (not Dr. Holmes), stating that it failed to provide interpreters. (R. 1, PageID.16-17.) Such imprecision makes it difficult to discern what Plaintiff intends to argue. Out of an abundance of caution, I will assume that Plaintiff intends to claim that Dr. Holmes should have ordered additional assistance, like an interpreter.

mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)) (internal quotation marks omitted). The subjective inquiry considers whether official's state of mind was sufficiently culpable; it requires a showing that an official "'knows of and disregards an excessive risk to inmate health or safety[.]'" *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008) (quoting *Farmer*, 511 U.S. at 837). "[T]he official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw the inference." *Id.* Inferences from circumstantial evidence can suffice to satisfy the subjective showing. *Magnum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017).

First is the objective prong. Defendant disputes that Plaintiff had a serious medical need, although he admits that, generally, "profound hearing loss is a sufficiently serious medical need." (R. 130, PageID.1311.) Courts that have considered hearing impairments in the abstract—*i.e.*, without regard to the specific level of a plaintiff's loss—have agreed. *See, e.g.*, *Degrafinreid v. Ricks*, 417 F. Supp. 2d 403, 412 (S.D. N.Y. 2006) ("Objectively, the ability to hear is a basic human need affecting daily activity and sufficiently serious to warrant treatment by physicians."); *see also Scott v. Clarke*, 64 F. Supp. 3d 813, 824-825 (W.D. Va. 2014) (finding plaintiff's hearing impairment to be a serious medical need).[6]

---

[6] Other courts have held that hearing loss might be a serious medical need if the plaintiff's loss was substantial enough. *See, e.g.*, *Gilmore v. Hodges*, 738 F.3d 266, 275 (11th Cir. 2013) ("The ability to hear is a basic human need materially affecting daily activity and a *substantial* hearing impairment plainly requires medical treatment by a physician." (emphasis added)); *Cooper v. Johnson*, 255 F. App'x 891, 891-892 (5th Cir. 2007) (finding that allegations the prison deprived plaintiff of a hearing aid raised a sufficient

Because Defendant concedes the point, I will assume that untreated, profound hearing loss is a serious medical need. Even without the concession, the risks posed in a prison setting by an inability to hear (due to untreated hearing loss) are patent. *See Gilmore*, 738 F.3d at 275-276 ("[A]n inmate's inability to hear may render him exceedingly vulnerable to danger and harm from his unperceived surroundings.").

It is the effect of treatment, however, that Defendant's objective-prong analysis attacks. He notes that Plaintiff has received treatment and cites caselaw holding that in such cases the plaintiff must provide "verifying medical evidence that an alleged delay or inadequacy [in treatment] caused him harm." (R. 130, PageID.1311, citing *Napier v. Madison Co.*, 238 F.3d 739 (6th Cir. 2001).) Because Plaintiff offered no medical proof of harm, Defendant concludes that the hearing loss cannot be considered a serious medical need. (R. 130, PageID.1311-1312.) Plaintiff's counter-argument interprets the case differently. (R. 139, PageID.1653.) He reads it as holding only that a delay in treatment triggers the need to give medical evidence; receiving treatment, without more, is insufficient. (R. 139, PageID.1653-1654.)

---

question as to "whether the provision of a hearing aid is a serious medical need"); *Large v. Washington Co. Detention Ctr.*, 915 F.2d 1564, 1990 WL 153978, at *1 (4th Cir. 1990) (unpublished) (holding that hearing loss could be a serious medical need); *Weinberg v. Hodges*, No. 4:09cv202, 2011 WL 1233486, at *2 (N.D. Fla. 2011) ("To be sure, not all hearing loss is a serious medical need. . . . But sometimes a hearing loss is a serious medical need that can be remedied with a hearing aid."); *Chacon v. Ofogh*, No. 7:08cv00046, 2008 WL 4146142, at *4 (W.D. Va. Sept. 8, 2008) ("While the ability to hear is a basic human need affecting daily activity and is sufficiently serious to warrant treatment by physicians, . . . Chacon has not shown that his hearing impairment rose to the level of a serious medical need.").

Defendant is correct that *Napier* involved delayed treatment. In that case, the plaintiff complained that failure to obtain prompt treatment caused harm. *Napier*, 238 F.3d at 742-743. The Sixth Circuit adopted a framework for such complaints that "examine[s] the seriousness of a deprivation by examining the effect of the delay in treatment." *Id.* at 742. Looking at the issue from this vantage, the court noted, narrowed the analysis to the severity of the alleged deprivation and the concomitant conditions threatening serious harm. *Id.* In such cases, inmates "'must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'" *Id.* (citation omitted). Thus, *Napier* by itself would not apply here. So far, so good for Plaintiff.

But in *Blackmore v. Kalamazoo Co.*, 390 F.3d 890 (6th Cir. 2004), the court suggested that the requirement has a broader scope. There, the court lumped in claims of delayed treatment with "claims based on a determination by medical personnel that medical treatment was unnecessary" and claims "involving whether the prisoner was treated adequately." *Id.* at 897-898. As such, "*Napier* applies where the plaintiff's 'deliberate indifference' claim is based on the prison's failure to treat a condition adequately . . . ." *Id.* 898. Where the need for treatment is obvious even to a layperson, however, "the plaintiff need not present verifying medical evidence to show that, even after receiving the delayed necessary treatment, his medical condition worsened or deteriorated." *Id.* at 900.

More recently still, the Sixth Circuit has reaffirmed *Blackmore*'s extension of *Napier*:

> But when an inmate has received on-going treatment for his condition and claims that this treatment was inadequate, the objective component of an Eighth Amendment claim requires a showing of care "so grossly

28

> incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989) ). The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013). This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the inmate received. *Anthony v. Swanson*, 701 F. App'x 460, 464 (6th Cir. 2017); *see Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) (explaining that adequacy-of-care claims may require expert testimony "to create a genuine dispute that the prisoner's medical needs are serious"). The plaintiff also must "place verifying medical evidence in the record to establish the detrimental effect" of the inadequate treatment.

*Rhinehart v. Scutt*, 894 F.3d 721, 737-738 (6th Cir. 2018); *cf. Nelson v. Shuffman*, 603 F.3d 439, 449 (8th Cir. 2010) ("In the fact of medical records indicating that treatment was provided and physician affidavits indicating that the care provided was adequate, an inmate cannot create a question of fact by merely stating that she did not feel she received adequate treatment." (citation omitted)). In the context of inadequate-care claims, this requirement exists because if the prisoner received adequate treatment, then there is no deliberate indifference claim. *Cf. Reaves v. Dep't of Correction*, 195 F. Supp. 3d 383, 409 (D. Mass. 2016) (noting that a prisoner must show the care is inadequate). The focus, then, is at the margins: was more treatment needed to remove substantial risk of harm and, if so, what form would the treatment take? Because this involves matters of degree in medicine, medical proof is needed. *See Rhinehart*, 894 F.3d at 737-738.

An instructive case for present purposes is *Irby v. Sumnicht*, 683 F. Supp. 2d 913 (W.D. Wis. 2010). As in this case, the plaintiff in *Irby* sued a prison doctor who rejected

his request for a second hearing aid, alleging deliberate indifference. *Id.* at 914. But he presented no evidence that the lack of a second hearing aid caused "significant pain," "substantially interfered with his daily activities," or "otherwise subjected him to a substantial risk of serious harm." *Id.* at 915. Only a single report indicated hearing loss in both ears, but nothing in it indicated the need for the second aid. *Id.* Plaintiff's own account of his medical maladies could not substitute for expert testimony. *Id.* at 916. Consequently, the record lacked evidence "regarding the nature and severity of . . . [the] alleged problems . . ." *Id.* His claim was rejected.

Here, Plaintiff's case suffers from the same problems. The nub of his properly exhausted contentions is that Defendant provided inadequate treatment by withholding a second hearing aid and an "assistant." (R. 139, PageID.1636.) Under the caselaw above, then, he had to offer medical evidence showing the necessity of the hearing aid or assistant and verifying the deleterious effects of its absence. He has not pointed to any evidence demonstrating these matters. Indeed, his brief hardly touches the medical records at all, let alone provides expert testimony to navigate them. At least some of the medical notes, such as audiological reports, are inscrutable to laypersons. *See, e.g.*, (R. 153, PageID.2104.)

In these circumstances, the Court is free to decline rummaging through the records for evidence that each of Plaintiff's ears needs help. *Street*, 886 F.2d at 1479-80. Even so, while a review of the medical reports reveals some evidence general hearing impairment— detailed in the fact section above, *see* (R. 88, PageID.939, 958, 959, 966; R. 153, PageID.2109)—evidence of hearing problems in his unassisted ear is scarce. In "Exhibit A's" (R. 153) nearly 2000 pages of medical materials, I could find only one indication that

the his second ear might require assistance: a three-sentence report from 2009 stating that "amplification is recommended bilaterally." (R. 153, PageID.2109.) The statement is too cursory and vague to create a material issue of fact as to whether Plaintiff's requests for a second aid stemmed from a serious medical need.

A few other records indicate general hearing problems but do not directly opine on Plaintiff's unassisted ear. One such record from 2011 reports that unnamed officers observed that generally Plaintiff did not hear loudspeaker announcements or their spoken instructions even with his hearing aid. (R. 88, PageID.958.) Perhaps an inference arises that both ears were impaired. But these statements likely are inadmissible hearsay, despite appearing in medical notes. *See* Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."); *Field v. Trigg Co. Hosp., Inc.*, 386 F.3d 729, 735-736 (6th Cir. 2004) (holding that the hearsay exception in Fed. R. Evid. 803(4) for statements made to receive medical treatment applies "only to statements made by the one actually seeking or receiving medical treatment"). Putting admissibility aside, the statements nonetheless fail to create a material issue of fact because they do not relate to the medical necessity or efficacy of additional treatment, particularly of the unaided ear.

Further piecemeal speculation on the arguments Plaintiff might have made is unnecessary, *Street*, 886 F.2d at 1479-80, and unwarranted, *see Greenlaw v. United States*, 554 U.S. 237, 243 (2008) ("In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral

arbiter of matters the parties present."). Ultimately, Plaintiff did not assemble and assess the evidence demonstrating a serious medical need for a second hearing aid or any other auditory assistance. I thus suggest Plaintiff's deliberate indifference claim fails on the objective prong of the deliberate-indifference inquiry.

He also falls short on the subjective side. The Supreme Court limned this area in *Farmer v. Brennan*, 511 U.S. at 834-847. The subjective nature of deliberate indifference follows from the Eighth Amendment's principle proscription of "only the unnecessary and wanton infliction of pain," and focus on the defendant's culpability. *Id.* at 834 (citation omitted). The culpable state of mind, the Court said, was not ordinary negligence—cruel and unusual punishment takes something more than run of the mill medical malpractice. *Id.* at 835; *see also Estelle*, 429 U.S. at 110. But not so much more that the defendant must intentionally or purposefully inflict injury. *Farmer*, 511 U.S. at 837. Instead, as noted above, the standard turns on whether the defendant "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The upshot, for present purposes, is that defendants who "responded reasonably to the risk," even if it occurs, have not violated the Eighth Amendment. *Id.* at 844-845.

Courts have accordingly rejected inadequate-treatment claims when the plaintiff received treatment but complained it was insufficient. *Bright v. Martin*, 37 F. App'x 136, 138 (6th Cir. 2002) ("In sum, it is clear that Bright received medical treatment for many years while incarcerated and has now concluded that he has a liver condition which Dr.

Messany did not treat properly. Accepting Bright's allegations as true, they amount to a medical malpractice claim and not an Eighth Amendment claim."); *Powell v. Messary*, 11 F. App'x 389, 390 (6th Cir. 2001) (An examination of the record shows that the defendants provided Powell with medical treatment for his condition, even though he may not have been satisfied with the treatment that he received. . . . Under these circumstances, Powell has alleged no more than a medical malpractice claim that is not cognizable under 42 U.S.C. § 1983."). A difference in opinion, therefore, is not enough. These results also flow from courts' reluctance "to second guess medical judgments . . ." *Oliver v. Wolfenbarger*, No. 07-12672, 2008 WL 4387210, at *8 (E.D. Mich. Sept. 24, 2008) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976)); *see also Chacon*, 2008 WL 4146142, at *3 ("[C]laims of medical judgment are not subject to judicial review.").

In the present case, Plaintiff's subjective-component argument focuses almost entirely on his unexhausted claim that Defendant canceled his special accommodation. (R. 139, PageID.1655-1657.) To the extent these contentions are relevant to the exhausted claims before the Court, they are nonetheless unpersuasive. The heart of his argument is that "allegations of malingering, not medical evidence," led Defendant to terminate the accommodation. (R. 139, PageID.1657.) This approach forces Plaintiff to attack the medical basis for Defendant's February 4, 2014 examination, thus running headlong into the caselaw above cautioning courts from critiquing a professional's judgment. (R. 139, PageID.1655 ("Here, Dr. Holmes did not conduct a good faith examination of Burley's medical need for a second hearing aid or the TTY phone."); *id.* at 1656 ("Dr. Holmes did

not conduct any other test or recommend that Burley see an audiologist before cancelling his Special Accommodation and denying him a second hearing aid.").

The argument, at base, quibbles with the medical techniques Defendant employed—in particular, measuring Plaintiff's hearing by covering his mouth while speaking. In essence, Plaintiff is contending that different or additional tools should have been used in the diagnosis and treatment. This amounts to a claim of negligence uncognizable under the Cruel and Unusual Punishments Clause. *Cf. Sanderfer v. Nichols*, 62 F.3d 151, 155 (6th Cir. 1995) ("While perhaps in hindsight Jansen *should* have checked Clayton's medical history records, her failure to do so is negligence at most.").

And Plaintiff fails to suggest what more Defendant should have done, what alternative diagnostic measures would have better captured the severity of his impairment. It is true that Plaintiff claimed to have not heard Defendant during the testing. But Defendant's decision relied upon additional rationale, including observations of him using the receiver of a telephone and his refusal to undergo testing to confirm his self-reports. (R. 153, PageID.3055.) Plaintiff now addresses his use of the telephone, offering an explanation that Defendant refused to hear at the examination. (R. 139-4, PageID.1678.) Should Defendant have taken the "minimal effort to verify this 'outside' information," as Plaintiff argues? (R. 139, PageID.1656.) Perhaps. Does his failure to do so amount to cruel and unusual punishment rather than ordinary negligence? It is hard to see how.

As for Plaintiff's refusal to submit to testing, he has little to say. The silence erodes his argument; if Defendant provided inadequate treatment because he insufficiently tested Plaintiff, but Plaintiff had rejected additional testing, what more was Defendant to do?

34

Plaintiff does not explain; nor does he acknowledge his then-recent trip to the audiologist, who made "no changes" to his treatment. (R. 153, PageID.3021.) And again it must be emphasized that these contentions center on an unexhausted claim.

Instead of demonstrating that Defendant acted unreasonably in the face of a known and substantial risk, Plaintiff relies on scraps of testimony to suggest that dark motives lurked behind Defendant's actions. (R. 139, PageID.1656-1657.) Specifically, he notes Defendant's deposition testimony that he attended the February 4 appointment "'to discontinue the special accommodation and that was it, pretty much,'" (R. 139, PageID.1656 (citing R. 139-6, PageID.1701)), as well as Defendant's statement that he had "to be sensitive to the corrections officers too,'" (R. 139, PageID.1656 (citing R. 139-6, PageID.1697).)

Of course, without a showing that Defendant acted unreasonably, it does not matter what motivated him to act *reasonably*. Even so, Defendant's statements were made in combination with others: the accommodation "wasn't medically necessary," (R. 130-5, PageID.1353), the reported misuse of the TTY displayed "normal powers of hearing," (*id.*), his unreasonable refusal to take additional tests was "clinically significant," (*id.* at PageID.1355), and Defendant could not recall Plaintiff ever struggling to hear him in conversation, (*id.* at PageID.1357). Defendant also determined that these reasons were not dislodged by Plaintiff's claim to not hear Defendant's covered counting on February 4, (*id.* at PageID.1355). Further, Defendant was correct that the appointment was to discontinue the accommodation; a January 30 record mentions an upcoming visit "to address discontinuing communication assistance TDD." (R. 153, PageID.3050.) Against this

35

additional testimony and evidence, Plaintiff's citation to the two statements fails to create a material issue of fact on Defendant's motivations, much less the reasonability of his medical treatment.

As for the second hearing aid and other assistance (*e.g.*, an interpreter), Plaintiff does not pinpoint the evidence or reasoning leading to the denial of that device or address Defendant's testimony on the topic. Defendant testified that requests for second hearing aids were rare, that MDOC policy usually limited inmates to one hearing aid, that Plaintiff requested the additional aid to help his balance but he had objectively normal balance, and that it was not medically necessary because one aid sufficed for daily living. (R. 130-5, PageID.1359-1360.) In addition, Plaintiff had just seen the audiologist in early January without any changes (except repairs) to his hearing aid. (R. 153, PageID.3021.) After that visit, Defendant wrote that the hearing "assistant" Plaintiff requested was not medically necessary. (R. 153, PageID.3025.) Plaintiff offers no opposing evidence, and thus fails to create a genuine issue of material fact regarding the reasonableness of Defendant's decision against prescribing a second hearing aid or ordering other assistance.

For these reasons, I suggest that Plaintiff has not satisfied the subjective component of the deliberate indifference test and that his Eighth Amendment claim should be rejected accordingly.

### c.    **First Amendment Free Speech and Free Exercise Claims**

Both First Amendment claims involve the same basic legal test, although for the reasons below it is unnecessary to employ the full test. I will analyze each in turn, starting with the free speech claim.

### i.      Free Speech

As an initial matter, the Court must assess what type of free speech claim is being made. Plaintiff's complaint characterized Defendant's termination of the special accommodation as retaliation against Plaintiff for filing grievances. (R. 1, PageID.37.) He did not, however, dress up the contention as a First Amendment retaliation claim. Defendant's motion for summary judgment nevertheless briefly addresses such a claim. (R. 130, PageID.1318-1319.) In response, Plaintiff ignores retaliation and instead focuses on the substantial burden that terminating the TTY accommodation imposed on his First Amendment right to communicate with the outside world. (R. 139, PageID.1647-1651.) Thus, Plaintiff is not pressing a retaliation claim.

The focus of the free speech issue, then, is the burden created by Defendant's actions. Specifically, Plaintiff grounds his claim on Defendant's revocation of TTY privileges. (R. 139, PageID.1651.) The Sixth Circuit has held that inmates have "First Amendment rights to communicate with family and friends," and this requires reasonable access to telephones. *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994). If hearing impairments leave the inmate reliant upon TDD or TTY systems, then the First Amendment might require access to those systems. *See Tanney v. Boles*, 400 F. Supp. 2d 1027, 1042 (E.D. Mich. 2005) (denying summary judgment against the plaintiff's claim that he lacked access to TDD/TTY systems).  But the access can be restricted for security interests and other reasons. *Washington*, 35 F.3d at 1100.

When a prison restriction impinges the inmate's First Amendment rights, courts assess the permissibility of the restriction under the multifactor test from *Turner v. Safley*,

482 U.S. 78 (1987). *See Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 213 (4th Cir. 2017); *Tanney*, 400 F. Supp. 2d at 1042. Those factors include (1) whether the restriction relates to legitimate penological interests, (2) whether the inmate has alternative means of exercising his or her right, (3) the impact that accommodating the inmate's request would have on the prison, and (4) whether an alternative approach could facilitate the inmate's rights at a lower cost. *Turner*, 482 U.S. at 89-91.

Here, however, Plaintiff's free speech argument can be dispensed with on exhaustion grounds. He relies solely on Defendant's termination of his TTY accommodation. As explained above, Plaintiff failed to exhaust that claim and thus is barred from raising it for the first time in court. For this reason, I recommend rejecting Plaintiff's First Amendment free speech claim.[7]

### ii.    Free Exercise

---

[7] Perhaps because the *Turner* factors were built largely to deal with regulatory restrictions on speech rather than medical determinations like the one here, the parties' arguments on the merits are unilluminating. For example, Defendant states that the TTY cancellation was reasonably related to legitimate penological interests because it prevented Plaintiff from using the TTY system to bypass MDOC monitoring or contact victims. (R. 130, PageID.1309.) Not only, however, does the record lack evidence supporting these assertions, but more importantly they are unrelated to why Defendant terminated the TTY: because he believed it was medically unnecessary.

Plaintiff more appropriately attacks the medical rationale for the decision, but his arguments run into the same problems as his deliberate indifference claim—namely, that he has not shown the medical necessity of the TTY. While the showing of necessity under deliberate indifference may differ from the showing under the First Amendment—that is, cancelling a TTY might not be cruel and unusual but it might nonetheless impinge free speech rights—the parties have not even discussed this possibility. Instead, Plaintiff relies on *Tanney* for the proposition that he "need only demonstrate 'that he was denied reasonable access to the TDD/TTY.'" (R. 139, PageID.1647, quoting *Tanney*, 400 F. Supp. 2d at 1043.) This assumes that he needed the TTY to communicate, an assumption that appears to have been accepted in *Tanney*. If Plaintiff does not need the TTY to communicate, however, then it is difficult to see how depriving him of this accommodation infringed on his First Amendment rights.

The *Turner* test also applies to claims that "[a] prison regulation or action" infringes free exercise rights. *Murphy v. Missouri Dep't of Corrections*, 372 F.3d 979, 982 (8th Cir. 2004); *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987). To succeed, a plaintiff must "allege a burden on his religious practice that endured at least to some extent as a result of the wrongful conduct." *Burley v. Abdellatif*, No. 16-cv-12256, 2018 WL 3300315, at *10 (E.D. Mich. Jan. 26, 2018). In the summary judgment context, the non-moving party "must do more than present some evidence on a disputed issue," but must offer "'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Regional Fed. Sav. Bank v. Margolis*, 835 F. Supp. 356, 358 (E.D. Mich. 1993) (quoting *Anderson*, 477 U.S. at 249-250)). "Although the nonmoving party's evidence in opposition to summary judgment need not be of the sort admissible at trial, he must employ proof other than his pleadings and own affidavits to establish the existence of specific triable facts." *Ashbrook v. Block*, 917 F.2d 918, 921 (6th Cir. 1990) (citing *Celotex*, 477 U.S. at 324).

In this case, Plaintiff has failed to create a genuine issue of material fact that Defendant unconstitutionally burdened his free exercise rights. Throughout his pleadings and filings, Plaintiff's complaints regarding religious practice, so far as they are related to Defendant, have been vague and conclusory and his "evidence" comprises his own statements, which by themselves are inadequate. He has not, for example, provided any instances of his attempts to participate in religious services that proved unsuccessful because he lacked a second hearing aid or interpreter. He has not even asserted that there were religious services for him to attend at Carson City. In fact, his deposition testimony

stated that the chaplain at Carson City "wouldn't allow us to form a religious group while I was there. . . . I couldn't get service there even though we had five members." (R. 130-6, 1408.) This statement is the only concrete allegation explaining why he was unable to participate at Carson City; it has nothing to do with Defendant or Plaintiff's hearing impairment.[8]

The only other evidence on the matter indicates Plaintiff did go to religious services, without mentioning any difficulties participating. At his deposition, for example, he testified that he "religiously" went to services on Fridays and a religious study group on Mondays. (*Id.*) Medical records from 2015 also include Plaintiff's reports that he attended services. *See* (R. 153, PageID.3556 ("He indicates that he has made friends, attends the Jewish Services . . . ."); R. 153, Page.3585 ("He reports involvement with exercise, law library, Jewish Services. He reports being able to relax . . . while in the Jewish service."); R. 153, PageID.3643 ("He states that he continues to go to the law library 5 days weekly, attend church services and read the Torah."); R. 153, PageID.1609 ("He also continues to attend religious services.").

Likewise, Plaintiff's complaint and recent affidavit offer no concrete allegations concerning infringement of his religious rights. The complaint appears to place the blame on the institutions, not Defendant, noting that Carson City and other MDOC facilities do not provide interpreters (or "adequate access to interpreters") for religious services. (R. 1,

---

[8] Also, he testified that after recent litigation made interpreters available, some of his requests in 2018 were denied. (R. 130-6, PageID.1419.) But even if these developments somehow related back to the exhausted grievances at issue in this case, he fails to suggest that Defendant played any role.

PageID.17.) Other relevant allegations in the complaint and his affidavit that might plausibly include Defendant are insubstantial. *See* (R. 1, PageID.21 ("Defendants[] all have imposed a substantial burden on plaintiff's religious exercise, services, and programs that other hearing individuals are accommodated with."); R. 1, PageID.29 ("[A]ll aforestated Defendants[] . . . deprived and continue to deprive Plaintiff of his free exercise of religion[.]"); R. 139-4, PageID.1677 ("These denials [of requests made to Defendant] burdened my ability to participate meaningfully in services, group meetings, and study sessions to further my observance and expressions of my Jewish faith."); *id.* ("Without access to a TTY phone, I was unable to effectively communicate regarding religious matters, specifically with a rabbi or other spiritual counselor . . . .").) In any event, these materials cannot alone create a disputed issue of material fact. *Ashbrook*, 917 F.2d 918, 921.

Similarly, and tellingly, the free-exercise analysis in Plaintiff's brief focuses on general issues with his hearing impairment and Defendant's slipshod treatment rather than specific religious programs that he could not meaningfully engage in. (R. 139, PageID.1645-1646.) Consequently, even if a reasonable inference arises that he would struggle to hear at religious services and that this struggle could constitute an unconstitutional burden, he has failed to put forward evidence that there were religious programs that Defendant thwarted him from attending attend. The only relevant evidence, then, is his testimony that no such services were available at Carson City because of the chaplain, not Defendant, and that later at other facilities he attended services and study

groups. As a result, I conclude that Plaintiff has failed to demonstrate an issue of material fact about Defendant's burdening of his free exercise rights.

### e.      Intentional Infliction of Emotional Distress (IIED)

Plaintiff's final claim, for IIED, comes from state law. Defendant raises the murky matter of whether the IIED claim sounds in medical malpractice and should be dismissed because Plaintiff did not comply with state procedural requirements in malpractice actions. (R. 130, PageID.1319-1321.) This issue can be avoided because, for the reasons that follow, Plaintiff's IIED claim fails on the merits.[9]

An IIED claim requires the plaintiff to show "(1) 'extreme and outrageous' conduct; (2) intent or recklessness; (3) causation; and (4) 'severe emotional distress.'" *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 602 (1985). "It is initially for the trial judge to decide whether defendant's conduct might reasonably be regarded as so extreme and outrageous as to allow recovery for intentional infliction of emotional distress." *Sawabini v. Desenberg*, 1372 N.W.2d 559, 565 (Mich. Ct. App. 1985). Outrageousness typically is measured by a vague exclamatory test: Would "the recitation of the facts to an average

---

[9] For that matter, it is unclear that treating the claim as one for medical practice provides the benefits Defendant hopes. In Michigan courts, the distinction between medical malpractice and other tort claims has significant implications. Plaintiffs filing medical malpractice actions must serve defendants a written notice 182 days before filing the complaint, Mich. Comp. Laws. 600.2912b, and they must include with the complaint an affidavit of merit signed by a health professional, Mich. Comp. Laws. 600.2912d. Defendant here thinks that because Plaintiff failed to satisfy these requirements, his claim must be dismissed. (R. 130, PageID.1320-1321.) As one court has ably explained, however, the affidavit-of-merit requirement is a state procedural rule that conflicts with Fed. R. Civ. P. 8 and thus does not apply in federal court. *Long v. Adams*, 411 F. Supp. 2d 701, 705-709 (E.D. Mich. 2006) (in a case arising under diversity jurisdiction). Likewise, the notice-of-intent requirement is a necessary prerequisite to commencing an action, *Bush v. Shabahang*, 484 Mich 156, 172 (2009), which means it could conflict with Fed. R. Civ. P. 8's pleading requirements and Fed. R. Civ. P. 3's pronouncement that an action commences with the filing of the complaint. Regardless, Plaintiff's claim need not turn on these matters because it fails on the merits.

member of the community . . . arouse his resentment against the actor, and lead him to

exclaim, 'Outrageous!'"? *Roberts*, 422 Mich. at 603. The plaintiffs must specify the

disputed outrageous conduct. *Mino v. Clio Sch. Dist.*, 661 N.W.2d 586, 598 (Mich. Ct.

App. 2003). As one court noted,

> Liability for the intentional infliction of emotional distress has been found
> only where the conduct complained of has been so outrageous in character,
> and so extreme in degree, as to go beyond all possible bounds of decency,
> and to be regarded as atrocious and utterly intolerable in a civilized
> community. . . . Liability does not extend to mere insults, indignities, threats,
> annoyances, petty oppressions, or other trivialities. It is not enough that the
> defendant has acted with an intent that is tortious or even criminal, or that he
> has intended to inflict emotional distress, or even that his conduct has been
> characterized by "malice," or a degree of aggravation that would entitle the
> plaintiff to punitive damages for another tort.

*Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999) (citations omitted).

Addressing the first element, outrageousness, Plaintiff offers no caselaw directly

supporting the proposition that failure to prescribe a second hearing aid or other assistance

is sufficiently execrable to sustain an IIED claim. In a footnote, he makes the rather meager

assertion that proving outrageousness "is not an insurmountable task." (R. 139,

PageID.1658 n. 6.) As evidence, he cites a case holding that an IIED claim was sufficiently

alleged where defendants had protested outside an abortion clinic with signs that identified

Plaintiffs' names and identified them as having had abortions. *Doe v. Mills*, 536 N.W.2d

824, 834 (Mich. Ct. App. 1995). Plaintiff here does not explain how Defendant's medical

decision to decline prescribing additional treatment is tantamount to publicly unfurling

intimate information about Plaintiff.

What is more, the Sixth Circuit, applying Michigan law, has rejected a claim similar to Plaintiff's. In *Garretson v. City of Madison Heights*, 407 F.3d 789, 794 (2005), the plaintiff claimed IIED when arresting police officers allegedly ignored her warnings that she needed insulin, leading to an emergency hospital visit lasting days. The court held that, even if a special relationship existed between the plaintiff and the police, she did not demonstrate that they intended (or would have expected) that denial of medical treatment would lead to emotional distress, nor did the conduct reach the level of outrageousness. *Id.* at 799-800. Here, too, Plaintiff alleges the same basic conduct—denial of medical treatment—and similarly has not raised an issue regarding outrageousness.

Failing to rely on caselaw, Plaintiff falls back upon the contention that Defendant "acted with a reckless disregard of the severe emotional distress to Burley . . . ." (R. 139, PageID.1658.) This move, in essence, converts his IIED claim into an ersatz deliberate indifference argument, focusing on how Defendant's decision to kibosh the TTY accommodation isolated Plaintiff and left him without means to contact friends and loved ones. (R. 139, PageID.1658-1659.) But for the same reasons his deliberate indifference claim failed, its iteration as an IIED claim succumbs as well: Plaintiff disputes the extent of medical care Defendant should have extended but he has not demonstrated with medical or other evidence that his need for a second hearing aid (or other help hearing or communicating) was so great that its denial could be considered cruel or outrageous.

To the extent he relies upon the deprivation of his TTY phone to show outrageousness, his claim likewise fails. As noted, he never brought or exhausted a grievance challenging the termination of his accommodation; this suffices to end his claim.

Further, he has not marshalled sufficient evidence to plausibly cast Defendant's decision as outrageous. As previously discussed, Defendant had information that Plaintiff was using the TTY phone in a manner suggesting he could use any normal phone. Perhaps Defendant was wrong, and maybe a more thorough assessment would have included extended questioning. This does not mean, however, that Defendant's reliance on the reports, the testing, and the refusal to submit to other testing somehow shocks the conscious and provokes exclamations of "outrageous." Such conduct might be unfortunate, but it is not intolerable enough to support an IIED claim. And Plaintiff presents no evidence or caselaw to the contrary.

For these reasons, I recommend granting Defendant's motion as to the IIED claim.

### C.    Conclusion

For the reasons above, I recommend that the Court **DENY** Defendants' motion to strike (R. 142), **DISMISS** Defendants Gerlach and Sherry pursuant to the parties' stipulation, **GRANT** the motion for summary judgment (R. 130) in favor of Defendant Holmes, and **DENY** Defendants' request for sanctions, (R. 139, PageID.1636 n. 1).

## II.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985);

*Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 25, 2019                           S/ PATRICIA T. MORRIS
                                                  Patricia T. Morris
                                                  United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 25, 2019                            By s/Kristen Castaneda
                                                  Case Manager